Filed 8/21/19; Opinion following transfer from Supreme Court

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B271516 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA404685) |
| v. | |
| JANETH LOPEZ et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County, Curtis B. Rappé, Judge.  Remanded with directions.

John A. Colucci, under appointment by the Court of Appeal, for Defendant and Appellant Janeth Lopez.

Janyce Keiko Imata Blair, under appointment by the Court of Appeal, for Defendant and Appellant Ivy Navarrete.

---

[*]     Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts 5 through 10 of the Discussion.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle, Amanda V. Lopez, Steven D. Matthews and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

_____

An act of vandalism—spraying graffiti on a church wall—ended with one person dead and a second wounded.  The shooter, Pedro Martinez, was convicted of first degree murder and attempted premeditated murder.  Following a mistrial and a second trial, Janeth Lopez, who had marked the church wall with spray paint, and Ivy Navarrete, who drove Martinez and Lopez away from the church after the shooting, were convicted of second degree murder and attempted premeditated murder with special findings the offenses had been committed to benefit a criminal street gang and a principal had personally discharged a firearm causing death or great bodily injury to the victims.

In a nonpublished opinion filed in August 2017 we rejected Lopez's and Navarrete's challenges to the propriety of their convictions for murder and attempted murder under the natural and probable consequences doctrine and to the sufficiency of the evidence to support the finding the crimes had been committed to benefit a criminal street gang, affirmed the judgment as modified to correct sentencing errors and remanded as to Lopez for further proceedings pursuant to *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*).

Lopez's and Navarrete's petitions for review were granted by the Supreme Court in November 2017, but further action was deferred pending consideration of a related issue in *People v. Mateo*, review granted May 13, 2016,  S232674, transferred to

2

court of appeal March 15, 2019—whether, to convict an aider and abettor of attempted premeditated murder under the natural and probable consequences doctrine, both premeditation and attempted murder must have been reasonably foreseeable by an individual committing the target offense. Before that case was decided, the Legislature enacted Senate Bill No. 1437 (SB 1437) (Stats. 2018, ch. 1015), which "amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder." (*Id*., § 1, subd. (f).) The Supreme Court then transferred this case to us with directions to vacate our decision and to reconsider it in light of SB 1437, as well as Senate Bill No. 620 (SB 620) (Stats. 2017, ch. 682), effective January 1, 2018, which authorized the trial court to strike or dismiss certain previously mandatory firearm enhancements. (*People v. Lopez* (Apr. 10, 2019, S243921) [2019 Cal. Lexis 2386].)

SB 1437 eliminates aider and abettor liability for murder under the natural and probable consequences doctrine, the sole theory advanced by the People at trial for convicting Lopez and Navarrete of murder. On remand Lopez and Navarrete will have the opportunity to petition the trial court, pursuant to newly enacted Penal Code section 1170.95,[1] to vacate their murder convictions and to be resentenced unless the People establish beyond a reasonable doubt that either of them is not entitled to be resentenced. (See § 1170.95, subd. (d)(3).) Lopez's and Navarrete's statutory and constitutional arguments to the contrary notwithstanding, however, SB 1437 does not affect their convictions for attempted premeditated murder under the

---

[1]    Statutory references are to this code unless otherwise stated.

3

natural and probable consequences doctrine.[2]  Accordingly, we again affirm those convictions, as well as the related criminal street gang enhancements.  On remand the trial court must also correct several sentencing errors, consider whether to exercise its discretion to dismiss or strike the firearm enhancement imposed on the attempted murder counts and conduct further proceedings pursuant to *Franklin, supra,* 63 Cal.4th 261 as to Lopez.

## FACTUAL BACKGROUND

1. *The Shootings*

In the early evening of November 4, 2012 Hipolito Acosta, Santos Baquiax and Andres Ordonez were in the back parking lot of a church at the corner of Beverly Boulevard and Reno Street in Los Angeles, preparing food for members of the congregation. When they heard the sound of shattering glass from the street, Acosta went to investigate.  He saw Lopez spray painting graffiti on the wall of the church and asked what she was doing.  Lopez replied, "Fuck off," and ran at Acosta, hitting him on the arm with the spray paint can.  Lopez knocked Acosta to the ground and kicked him, all the while yelling at him.

As Lopez was attacking Acosta, Baquiax and Ordonez came out from the parking lot.  When Baquiax was about six feet from Acosta, and Ordonez about 12 feet away, Lopez ran to a BMW parked in front of the church.  Acosta saw her throw the spray paint can on the ground.

As Lopez ran back to the BMW, Martinez got out of the back seat of the car and fired three or four shots in the direction

---

[2]     Lopez and Navarrete have joined in all contentions raised by one that might also accrue to the other's benefit.  (See Cal. Rules of Court, rule 8.200(a)(5).)

4

of Baquiax and Ordonez.  One bullet hit Baquiax in the shoulder, and he fell to the ground.  Another bullet struck Ordonez in the chest; he managed to walk back to the parking lot, where he collapsed.  Ordonez died from the bullet wound to his chest.

Martinez returned to the BMW.  Baquiax saw someone in the driver's seat but could not tell if it was a man or a woman.  The BMW drove away.

2.  *The Investigation*

Officers from the Los Angeles Police Department arrived at the scene shortly after the shootings.  They recovered three shells, which had been fired from a semiautomatic weapon, from the sidewalk and found a spray paint can by the curb.  Lopez's fingerprint and DNA were on the can.  The police also found a broken beer bottle in the gutter near the spray paint can.  Navarrete's fingerprint and DNA were on the bottle.  Graffiti found on a nearby building contained three names: "Looney," "Wicked" and "Ivy."  It also had the words, "Fuck Tampax."

On November 7, 2012 Baquiax identified Lopez from a photographic lineup as the woman he saw hitting Acosta.  Baquiax also identified Martinez from a photographic lineup as the shooter.  On November 8, 2012 Acosta also identified Lopez from a photographic lineup.  He was not certain of his identification but thought she "could be the one."

Officers arrested Lopez at her home a few miles from the crime scene on November 8, 2012.  The following day Navarrete's home was searched.  The officers found a letter Lopez sent to Navarrete in 2008 that referred to "Rockwood" and was signed "from Looney."  Officers also found a photograph of Lopez and Navarrete together; Lopez was making a Rockwood Street gang hand symbol.

5

At the time of the church shooting Navarrete had been living with Sonia Vallejo. Navarrete and Vallejo's stepson had a child together. According to Vallejo, Navarrete and Lopez were close friends and spent weekends together. Navarrete, who drove a grey BMW, provided transportation for Lopez, who did not have a car. Navarrete also talked to someone named Pedro or Peter.

On the day of the shooting, Friday, November 4, 2012, Navarrete told Vallejo she was going to be with Lopez. Navarrete returned home Sunday night. Several days later Navarrete was gone, leaving her child and all her belongings at Vallejo's home. Navarrete and Martinez were found and detained in Mexico in February 2013.

The police examined cell phones belonging to Lopez, Navarrete and Martinez. Lopez's contacts included Navarrete and Martinez. Navarrete and Martinez had exchanged text messages; Martinez had made calls to Lopez. On the evening of November 6, 2012 all three cell phones had been in the same general area near Lopez's home and near the scene of the shooting.

3. *Gang Evidence*

Los Angeles Police Officer Antonio Hernandez testified Rockwood Street was a criminal street gang that had started in the early 1980's. In November 2012 it had about 180 members, including 20 active members. (Officer Hernandez defined active members as members who were not incarcerated.) The gang had its own territory, symbols and hand signs. The gang's primary activities included murder, robbery, assault and extortion. Rockwood Street members were convicted of murder in 2007 and 2008.

Officer Hernandez explained Rockwood Street had subsets or cliques based on location.  Two of the cliques were Westmoreland and K.T.O.  Members of these two cliques got along with one another and engaged in joint activities.

According to Officer Hernandez, the Temple Street gang had been Rockwood Street's enemy since 2003; and members of the two gangs tried to eliminate or kill each other.  Rockwood Street members used "Tampax" as a derogatory term for Temple Street members.  The areas where the shootings took place and the additional graffiti was discovered were in Temple Street territory.

Officer Hernandez knew Lopez to be a Rockwood Street member in the K.T.O. clique with the moniker "Looney."  She had admitted being a member, had Rockwood Street tattoos, had appeared in photographs with other Rockwood Street members making gang signs and had sent text messages discussing "Temple" and being in its territory.

The text messages on Lopez's cell phone referred to her being "in the hood" and "posted with the homies," which signified she was out in public with other gang members.  "I went writing to the Tampax hood," a message also found on her phone, meant she had been tagging in Temple Street territory.

Officer Hernandez believed Martinez was a Rockwood Street member in the Westmoreland clique, with the gang monikers "Rabbit" and "Wicked."  Martinez had Rockwood Street tattoos on his head, arms, legs and body.

Officer Hernandez opined that Navarrete was a Rockwood Street associate based on his previous contact with her, the fact her boyfriend, Martinez, was a gang member and the 2008 letter Lopez had written to Navarrete discussing Rockwood Street.

According to Officer Hernandez, Lopez would not write such things to an individual who was not associated with the gang. The officer explained the term "associate" was used for someone who was seen with the gang in public and might be involved in criminal activity with the gang but either was not a formal member of the gang or, due to insufficient information, could not be determined by law enforcement to be a gang member.

Officer Hernandez explained that tagging crews use graffiti as art, while gang members use graffiti to mark their territory. Territory is very important to gang members, and infiltrating another gang's territory is an aggressive sign of disrespect. Putting up graffiti in a rival gang's territory would boost a gang member's respect within his or her own gang. However, a gang member engaging in this activity could expect members of the rival gang to react with violence, including assault with a deadly weapon or murder, if caught in the act. For this reason, a gang member putting up graffiti in rival territory would often go with a group that might include a getaway driver and a shooter in case there was a violent confrontation.

Given a hypothetical based on the facts of the case, Officer Hernandez opined the shootings were for the benefit of, and in association with, a criminal street gang: It showed the gang was able to put up graffiti in its rival's territory, and no one was capable of preventing it from doing so.

The fresh graffiti found on the building near the shooting scene included the word "REST" with the "T" crossed out, as a sign of disrespect to Temple Street, and "Fuck Tampax," another sign of disrespect. The names "Looney," "Wicked" and "Ivy" were a roll call of the participants. Officer Hernandez stated this

graffiti was similar to the graffiti Lopez had placed on the church wall.

4. *Defense*

Neither Lopez nor Navarrete testified in her own defense. Ana Mendez, Ordonez's wife, told the police that she saw a man drive up in a black car, get out and begin shooting.

In an interview shortly after the shooting, Veronica Canales told the police that two men waited in the car while the female tagger attacked Acosta. However, in a November 8, 2012 interview Canales said a man got out of the rear of the car and started shooting. She did not really see the car or who was in it because she was focused on the attack on Acosta.

## PROCEDURAL BACKGROUND

1. *The First Trial*

On July 15, 2013 Lopez, Navarrete and Martinez were charged by information with the murder of Ordonez (§ 187, subd. (a); count 1); attempted willful, deliberate and premeditated murder of Baquiax (§§ 187, subd. (a), 664; count 2) and Acosta (count 3); and misdemeanor vandalism—graffiti—with damage under $400 (§ 594, subd. (a); count 4). The information alleged that in the commission of the murder and attempted murders a principal had personally used and intentionally discharged a firearm (§ 12022.53, subds. (b), (c), (e)(1)) and, as to counts 1 and 2, the principal's personal use and discharge of the firearm caused great bodily injury and death (§ 12022.53, subds. (d), (e)(1)). The information further alleged the crimes had been committed for the benefit of a criminal street gang (§ 186.22, subds. (b)(1)(C), (d)). The information also alleged that Navarrete and Martinez each had a prior conviction

9

of a serious or violent felony within the meaning of the three strikes law (§§ 667, subds. (b)-(i), 1170.12).

At the initial trial in the case, the jury convicted Martinez of first degree murder, one count of attempted premeditated murder (Baquiax) and vandalism and found true the firearm-use and criminal street gang enhancement allegations. It was unable to reach a verdict as to the second count of attempted murder (Acosta).[3]

The jury convicted Lopez and Navarrete of vandalism and found true the criminal street gang allegations. It was unable to reach a verdict as to the remaining charges, and the trial court declared a mistrial as to those counts.

2. *The Second Trial and Sentencing*

When the case was called for retrial on November 9, 2015, on the People's motion the trial court dismissed the count alleging Acosta's attempted murder. The jury then convicted Lopez and Navarrete of second degree murder and attempted willful, deliberate and premeditated murder. It found true the special allegations a principal had personally and intentionally discharged a firearm in the commission of the crimes, causing great bodily injury and death, and the crimes were committed for the benefit of a criminal street gang.

The trial court sentenced Lopez to an aggregate indeterminate state prison term of 40 years to life: 15 years to life for second degree murder, plus 25 years to life for the firearm-use enhancement on that count; and a concurrent term of life for attempted premeditated murder with a minimum parole

---

[3] We affirmed Martinez's convictions in 2016. (*People v. Martinez* (Dec. 12, 2016, B262799) [nonpub. opn.].)

eligibility date of 15 years based on the criminal street gang enhancement, plus 25 years to life for the firearm-use enhancement on that count. The court also imposed and stayed 10-year criminal street gang enhancements on those two counts and imposed and stayed a two-year term for vandalism, which became punishable as a felony because of the gang enhancement.

The court sentenced Navarrete to an aggregate indeterminate state prison term of 60 years to life: 15 years to life for second degree murder, doubled for the prior strike, plus 25 years to life for the firearm-use enhancement on that count, plus five years for a prior serious felony conviction; and a concurrent term of life imprisonment for attempted premeditated murder, with a minimum parole eligibility date of 30 years, plus 25 years to life for the firearm-use enhancement on that count, plus five years for the prior serious felony conviction. As with Lopez, the court also imposed and stayed 10-year criminal street gang enhancements on those two counts and imposed and stayed a two-year felony term for vandalism.

## DISCUSSION

1. *SB 1437: Redefining Accomplice Liability for Murder*
   a. *Senate Concurrent Resolution No. 48, the precursor to SB 1437*

In September 2017, a year prior to enactment of SB 1437, the Legislature adopted Senate Concurrent Resolution No. 48 (2017-2018 Reg. Sess.) resolution chapter 175 (SCR 48), recognizing the need for statutory changes to more equitably sentence offenders in relation to their involvement in the criminal activity. Most of the resolution's "whereas" clauses focused on the felony-murder rule. However, SCR 48 also stated, "[R]eform is needed in California to **limit convictions** and **subsequent sentencing** in both felony murder cases and aider

11

and abettor matters prosecuted under [the] 'natural and probable consequences' doctrine so that the law of California fairly addresses the culpability of the individual and assists in the reduction of prison overcrowding, which partially results from lengthy sentences which are not commensurate with the culpability of the defendant"; and observed that the natural and probable consequences doctrine "result[s] in individuals lacking the mens rea and culpability for murder being punished as if they were the ones who committed the fatal act." SCR 48 also noted, "It can be cruel and unusual punishment to not assess individual liability for nonperpetrators of the fatal act or in nonhomicide matters the criminal charge resulting in prosecution and impute culpability for another's bad act, thereby imposing lengthy sentences that are disproportionate to the conduct in the underlying case."

Following 28 "whereas" provisions, the Senate, with the Assembly concurring, resolved "[t]hat the Legislature recognizes the need for statutory changes to more equitably sentence offenders in accordance with their involvement in the crime."

b. *SB 1437*

On September 30, 2018 the Governor signed SB 1437, which, effective January 1, 2019, amended sections 188 and 189 and added section 1170.95 to the Penal Code, significantly modifying the law relating to accomplice liability for murder. In its uncodified findings and declarations the Legislature referred to SCR 48, "which outlines the need for the statutory changes contained in this measure" (Stats. 2018, ch. 1015, § 1, subd. (c)), and stated, "It is necessary to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a

12

person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (*Id.*, § 1, subd. (f).) The Legislature also declared, "Except as stated in subdivision (e) of Section 189 of the Penal Code [relating to first degree felony murder], a conviction for murder requires that a person act with malice aforethought. A person's culpability for murder must be premised upon that person's own actions and subjective mens rea." (*Id.*, § 1, subd. (g).)

To effectuate this legislative purpose, SB 1437 added a crucial limitation to section 188's definition of malice for purposes of the crime of murder.[4] New section 188, subdivision (a)(3), provides, "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime."[5]

New section 189, subdivision (e), in turn, provides with respect to a participant in the perpetration or attempted perpetration of a felony listed in section 189, subdivision (a), in which a death occurs—that is, as to those crimes that provide the basis for the charge of first degree felony murder—that the

---

[4] Section 187 defines murder as "the unlawful killing of a human being, or a fetus, with malice aforethought."

[5] Prior to enactment of SB 1437, section 188, subdivision (a), provided, "For purposes of Section 187, malice may be express or implied. [¶] (1) Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature. [¶] (2) Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."

13

individual is liable for murder "only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."[6]

SB 1437 also added section 1170.95, which permits those convicted of felony murder or murder under a natural and probable consequences theory to petition the sentencing court to vacate the conviction and to be resentenced on any remaining counts if he or she could not have been convicted of first or second degree murder because of SB 1437's changes to sections 188 and 189. (§ 1170.95, subd. (a).) If the prosecutor does not stipulate to vacating the conviction and resentencing the petitioner, the People have the opportunity to present new and additional evidence to demonstrate the petitioner is not entitled to resentencing. (§ 1170.95, subd. (d)(3).) The petitioner also has the opportunity to present new or additional evidence in support of the resentencing request. (*Ibid.*)

---

[6] The conditions for imposing liability for first degree felony murder specified in section 189, subdivision (e), do not apply to a participant in one of the enumerated felonies when the victim is a peace officer who was killed while in the course of his or her duties when the defendant knew or reasonably should have known that the victim was a peace officer engaged in the performance of his or her duties. (See § 189, subd. (f).)

14

> c. *SB 1437 eliminates liability for murder under the natural and probable consequences doctrine*
> i. <u>*People v. Chiu* and its extension to conspiracies</u>

In *People v. Prettyman* (1996) 14 Cal.4th 248, 259-260 (*Prettyman*), the Supreme Court explained, "It sometimes happens that an accomplice assists or encourages a confederate to commit one crime, and the confederate commits another, more serious crime (the nontarget offense). Whether the accomplice may be held responsible for the nontarget offense turns not only upon a consideration of the general principles of accomplice liability set forth in *People v. Beeman* [(1984)] 35 Cal.3d 547, but also upon a consideration of the 'natural and probable consequences' doctrine . . . ."

Addressing the scope of the doctrine, the *Prettyman* Court held, "Under the 'natural and probable consequences' doctrine . . . , the jury must decide: whether the defendant (1) with knowledge of the confederate's unlawful purpose; and (2) with the intent of committing, encouraging, or facilitating the commission of any target crime(s); (3) aided, promoted, encouraged, or instigated the commission of the target crime(s). The jury must also determine whether (4) the defendant's confederate committed an offense *other than* the target crime(s); and whether (5) the offense committed by the confederate was a natural and probable consequence of the target crime(s) that the defendant encouraged or facilitated." (*Prettyman*, *supra*, 14 Cal.4th at p. 271; accord, *People v. Chiu* (2014) 59 Cal.4th 155*,* 158 (*Chiu*) ["under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also "for any other offense that was a 'natural and

15

probable consequence' of the crime aided and abetted"'"], quoting *People v. McCoy* (2001) 25 Cal.4th 1111, 1117; see § 31.)[7]

"A nontarget offense is a "'natural and probable consequence'" of the target offense if, judged objectively, the additional offense was reasonably foreseeable. [Citation.] The inquiry does not depend on whether the aider and abettor actually foresaw the nontarget offense. [Citation.] Rather, liability "'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.'" [Citation.] Reasonable foreseeability 'is a factual issue to be resolved by the jury.'" (*Chiu, supra*, 59 Cal.4th at pp. 161-162, quoting *People v. Medina* (2009) 46 Cal.4th 913, 920.)

In *Chiu*, *supra*, 59 Cal.4th 155 the Supreme Court restricted the reach of the natural and probable consequences doctrine in murder cases, holding an aider and abettor may not be convicted of first degree premeditated murder under the doctrine. (*Id*. at pp. 158-159.) The Court explained, "Aider and abettor culpability under the natural and probable consequences doctrine is vicarious in nature." (*Id*. at p. 164.) "'Because the nontarget offense is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant and culpability is imposed simply because a reasonable person could have foreseen

---

[7] Section 31 provides, "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . are principals in any crime so committed."

16

the commission of the nontarget crime.'" (*Ibid*.) Although aider and abettor liability is not directly measured by that actor's conduct or mental state, "the legitimate public policy concern of deterring aiders and abettors from aiding or encouraging the commission of offenses that would naturally, probably, and foreseeably result in an unlawful killing," the Court reasoned, would be "served by holding them culpable for the perpetrator's commission of the nontarget offense of second degree murder." (*Id*. at p. 165.)

The public policy concern for deterrence, however, "loses its force in the context of a defendant's liability as an aider and abettor of a first degree premeditated murder. First degree murder, like second degree murder, is the unlawful killing of a human being with malice aforethought, but has the additional elements of willfulness, premeditation, and deliberation which trigger a heightened penalty. [Citation.] That mental state is uniquely subjective and personal. It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death. [Citations.] . . . [T]he connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine, especially in light of the severe penalty involved and the above stated public policy concern of deterrence." (*Chiu, supra*, 59 Cal.4th. at p. 166.) For these reasons, the Court held "that punishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that

17

would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine." (*Ibid*.)

Less than a year after *Chiu*, the Third District in *People v. Rivera* (2015) 234 Cal.App.4th 1350 held the *Chiu* analysis applies to a conviction for murder based on the natural and probable consequence of a conspiracy. The court recognized "'the conspirator need only intend to agree or conspire and to commit the offense which is the object of the conspiracy [citation]; while the aider and abettor must intend to commit the offense or to encourage or facilitate its commission.'" (*Id*. at p. 1356, fn. 5.) However, "[u]nder both these theories, the extension of liability to additional reasonably foreseeable offenses rests on the 'policy [that] conspirators and aiders and abettors should be responsible for the criminal harms they have naturally, probably and foreseeably put in motion.' [Citation.] The problem with extending a defendant's liability for a first degree premeditated murder to an aider and abettor (and we hold also a coconspirator) under the natural and probable consequences doctrine was explained in *Chiu* . . . ." (*Id*. at pp. 1356-1357; accord, *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1144; *In re Lopez* (2016) 246 Cal.App.4th 350, 357.)

ii. *Malice is now an essential element of liability for murder other than first degree felony murder as defined in section 189*

As the Supreme Court explained in *Chiu*, by its very nature, aider and abettor liability under the natural and probable consequences doctrine is not premised on the intention of the aider and abettor to commit the nontarget offense because the nontarget offense was not intended at all. The doctrine imposes vicarious liability for any offense committed by the direct

perpetrator that is a natural and probable consequence of the target offense. It is not an implied malice theory; the mens rea of the aider and abettor with respect to the nontarget offense, actual or imputed, is irrelevant. (*Chiu, supra*, 59 Cal.4th at p. 164.)[8] Rather, liability is imposed because a reasonable person could have foreseen the commission of the additional offense. (*Ibid.*)

SB 1437 significantly restricted potential aider and abettor liability, as well as coconspirator liability, for murder under the natural and probable consequences doctrine, effectively overruling *Chiu* insofar as it upheld second degree murder convictions based on that theory. Now, rather than an objective, reasonable foreseeability standard, as discussed in *Prettyman* and *Chiu*, pursuant to new section 188, subdivision (a)(3), to be guilty of murder other than as specified in section 189, subdivision (e), concerning felony murder, the subjective mens rea of "malice aforethought" must be proved: "[T]o be convicted of murder, a principal in a crime shall act with malice aforethought." (See also SB 1437 (Stats. 2018, ch. 1015, § 1, subd. (g) ["[a] person's culpability for murder must be premised upon that person's own actions and subjective mens rea"].) And

---

[8]     The felony-murder rule, in contrast, is predicated on the imputation of malice to all the participants in the underlying felony. (See *People v. Bryant* (2013) 56 Cal.4th 959, 965 ["'[t]he felony-murder doctrine, whose ostensible purpose is to deter those engaged in felonies from killing negligently or accidentally, operates to posit the existence of that crucial mental state—and thereby to render irrelevant evidence of actual malice or the lack thereof—when the killer is engaged in a felony whose inherent danger to human life renders logical an imputation of malice on the part of all who commit it'"].)

that required element of malice "shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).)[9]

 2. *SB 1437 Does Not Modify Accomplice Liability for Attempted Murder*

SB 1437 does not mention the crime of attempted murder. Nonetheless, citing to several of the Legislature's findings and declarations in the uncodified portion of SB 1437, Lopez and Navarrete urge us to extend the legislation's ameliorative provisions to their convictions for attempted premeditated murder. Lopez and Navarrete's proposed construction of amended section 188 does violence to the governing principles of statutory interpretation.

"'"As in any case involving statutory interpretation, our fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose."'" (*People v. Gonzalez* (2017) 2 Cal.5th 1138, 1141; see *Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1332 ["[i]n interpreting a statute, our primary goal is to determine and give effect to the underlying purpose of the law"].)

---

[9]  The court of appeal in *People v. Gentile* (2019) 35 Cal.App.5th 932, 943-944, which concluded SB 1437 does not eliminate all second degree murder liability based on the natural and probable consequences doctrine, appears to have misread section 189, subdivision (e). Although that provision authorizes a conviction for murder when the defendant, although acting without malice, was a major participant in certain underlying felonies and acted with reckless indifference to human life, it does so solely in the context of the felony-murder rule. There is no comparable exception to SB 1437's elimination of murder liability for an aider and abettor under the natural and probable consequences doctrine.

20

"""[W]e begin by examining the statute's words, giving them a plain and commonsense meaning.""" (*Gonzalez*, at p. 1141.) "We must follow the statute's plain meaning, if such appears, unless doing so would lead to absurd results the Legislature could not have intended." (*People v. Birkett* (1999) 21 Cal.4th 226, 231; accord, *Connor v. First Student, Inc.* (2018) 5 Cal.5th 1026, 1035 [""[i]f the statute's text evinces an unmistakable plain meaning, we need go no further""]; see *People v. Gray* (2014) 58 Cal.4th 901, 906 ["[i]f no ambiguity appears in the statutory language, we presume that the Legislature meant what it said, and the plain meaning of the statute controls"].)

Here, there is nothing ambiguous in the language of SB 1437, which, in addition to the omission of any reference to attempted murder, expressly identifies its purpose as the need "to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) Had the Legislature meant to bar convictions for attempted murder under the natural and probable consequences doctrine, it could easily have done so. (See *People v. Jillie* (1992) 8 Cal.App.4th 960, 963 [statute expressly identifies offenses within its scope, "all of which are completed offenses. Had the Legislature meant to include attempts among the covered offenses, it could easily have done so . . ."]; see also *People v. Reed* (2005) 129 Cal.App.4th 1281, 1283 [enhancement for prior drug conviction was unauthorized because, unlike a conviction for possession of a controlled substance for sale, defendant's

conviction for attempted possession of a controlled substance for sale was not included within the enhancement statute; "[a]n attempt is an offense 'separate' and 'distinct' from the completed crime"].)[10]

The Legislature's obvious intent to exclude attempted murder from the ambit of the SB 1437 reform is underscored by the language of new section 1170.95, the provision it added to the Penal Code to permit individuals convicted before SB 1437's effective date to seek the benefits of the new law from the sentencing court. Section 1170.95, subdivision (a), authorizes only those individuals "convicted of felony murder or murder under a natural and probable consequences theory" to petition for relief; and the petition must be directed to "the petitioner's murder conviction." Similarly, section 1170.95, subdivision (d)(1), authorizes the court to hold a hearing to determine whether to vacate "the murder conviction."

The plain language meaning of SB 1437 as excluding any relief for individuals convicted of attempted murder is fully supported by its legislative history. (See *In re Tobacco II Cases* (2009) 46 Cal.4th 298, 316 ["even though recourse to extrinsic material is unnecessary given the plain language of the statute, we may consult it for material that buttresses our construction of

---

[10] As the Attorney General observes in his supplemental brief following transfer of the case to us, the Legislature in SB 1437 demonstrated its awareness that a completed crime and an attempt to commit that crime are distinct offenses, limiting first degree felony murder liability for "[a] participant in the perpetration or attempted perpetration of a felony listed in [section 189,] subdivision (a) in which a death occurs . . . ." (SB 1437 (Stats. 2018, ch. 1015, § 3, subd. (e)).)

the statutory language"]; *California School Employees Assn. v. Governing Board* (1994) 8 Cal.4th 333, 340 ["Ordinarily, if the statutory language is clear and unambiguous, there is no need for judicial construction. [Citation.] Nonetheless, a court may determine whether the literal meaning of a statute comports with its purpose"].) When describing the proposed petition process, the Legislature consistently referred to relief being available to individuals charged in a complaint, information or indictment "that allowed the prosecution to proceed under a theory of first degree felony murder, second degree felony murder, or murder under the natural and probable consequences doctrine" and who were "sentenced to first degree or second degree murder." (E.g., Assem. Com. on Public Safety, Rep. on Sen. Bill No. 1437 (2017-2018 Reg. Sess.) as amended May 25, 2018, p. 1.) In addition, when discussing the fiscal impact and assessing the likely number of inmates who may petition for relief, the Senate Committee on Appropriations considered the prison population serving a sentence for first and second degree murder and calculated costs based on that number. (See Sen. Com. on Appropriations, Rep. on Sen. Bill No. 1437 (2017-2018 Reg. Sess.) as introduced Feb. 16, 2018, p. 3 (Sen. Com. Appropriations Report).) The analysis of potential costs did not include inmates convicted of attempted murder.

Lopez and Navarrete's contention that, by redefining the elements of murder, SB 1437 impliedly eliminated the natural and probable consequences doctrine as a basis for finding an aider and abettor guilty of attempted murder is similarly unavailing. The premise of this implied repeal argument is that, generally to be guilty of an attempt to commit a crime, the defendant must have specifically intended to commit all the

elements of that offense. Since a conviction for murder now requires proof of malice except as specified in section 189, subdivision (e), and malice may not be imputed to a person based solely on his or her participation in an underlying crime, they reason, the natural and probable consequences theory of aider and abettor liability is no longer viable.

Lopez and Navarrete's premise, that to be guilty of an attempt an accomplice must have shared the actual perpetrator's intent, is correct as to direct aider-and-abettor liability (*People v. McCoy*, *supra*, 25 Cal.4th at p. 1118 ["when the charged offense and the intended offense—murder or attempted murder—are the same, . . . the aider and abettor must know and share the murderous intent of the actual perpetrator"]; see *Chiu*, *supra*, 59 Cal.4th at pp. 158, 167), but it is inapplicable to offenses charged under the natural and probable consequences doctrine, which is based on a theory of vicarious liability, not actual or imputed malice (*Chiu*, at pp. 158, 164). As a matter of statutory interpretation, SB 1437's legislative prohibition of vicarious liability for murder does not, either expressly or impliedly, require elimination of vicarious liability for attempted murder.

Citing *People v. King* (1993) 5 Cal.4th 59 and several court of appeal decisions, Lopez and Navarrete also argue remedial legislation should be applied to lesser included offenses and, in particular, we should construe SB 1437 to extend the benefit provided to individuals convicted of murder to those convicted of attempted murder.[11] *King*, however, involved a decidedly

---

[11] Lopez and Navarrete cite several cases that describe attempted murder as a lesser included offense of murder, based at least in part on the timeworn adage that every completed crime necessarily involves an attempt to commit it. (See, e.g.,

different situation in which a series of then-operative provisions of the Penal Code and the Welfare and Institutions Code, combined with prior decisions of the Supreme Court, on their face permitted a person under the age of 18 who had committed first degree murder and was tried as an adult to be sentenced to the California Youth Authority (CYA), while the same person who had attempted but failed to commit the same crime was not eligible for CYA, but instead was to be sentenced to prison. (*Id.* at pp. 62-63.) Recognizing that this result made no sense, and reviewing the legislative history of the statutory change that created the anomaly, the Court explained, "The clear legislative intent to make first degree murderers under the age of 18—and by extension those who attempt but fail to commit the crime— eligible for CYA should prevail over any irrational result caused by the amendment of different statutes in separate codes at different times for unrelated purposes. '[T]he "plain meaning" rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent ent with other provisions of the statute.'" (*Id.* at p. 69.)

---

*People v. Davidson* (2008) 159 Cal.App.4th 205, 210; see generally *People v. Vanderbilt* (1926) 199 Cal. 461, 463.) The continued validity of those statements is by no means apparent given the Supreme Court's holding in *People v. Bailey* (2012) 54 Cal.4th 740, 749, that "[u]nder the elements test, attempt to escape is not a lesser included offense of escape since it requires additional proof that the prisoner actually intended to escape." Similarly, the crime of attempted murder requires proof of the "specific intent to kill" (see *People v. Lee* (2003) 31 Cal.4th 613, 623), which is not necessarily an element of (implied malice) murder.

Here, in contrast, we are not dealing with "amendments of different statutes in separate codes at different times" leading to an unintended result, but a single piece of legislation in which the Legislature unequivocally elected, both in the words it chose and its statement of purpose, to provide a benefit to one category of aiders and abettors prosecuted under the natural and probable consequences doctrine—those facing the lengthiest prison sentences—and not to others. *People v. King, supra*, 5 Cal.4th 59, like Lopez and Navarrete's other arguments, does not justify a departure from the plain meaning of SB 1437.

3. *The Legislature's Decision To Limit the Reform of Aider and Abettor Liability Under the Natural and Probable Consequences Doctrine to Instances Where the Nontarget Offense Is Murder Does Not Violate Equal Protection*

If SB 1437 does not include individuals charged with, or convicted of, attempted murder under the natural and probable consequences doctrine, Lopez and Navarrete contend, then the Legislature's reform effort violates principles of equal protection because it is irrationally underinclusive, permitting imposition of a more severe penalty on an accomplice under the natural and probable consequences doctrine when the victim of the nontarget assault survives than when the victim is killed.[12] As a remedy,

_____

[12] Lopez and Navarrete have urged us to avoid this issue by applying the canon of constitutional avoidance and interpreting SB 1437 to prohibit convictions for attempted murder under the natural and probable consequences doctrine. This well-established principle of statutory construction, however, "'is qualified by the proposition that "avoidance of a difficulty will not be pressed to the point of disingenuous evasion."'" (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1373; see *People v. Buza* (2018) 4 Cal.5th 658, 682 ["a statute will be interpreted to avoid serious

rather than striking SB 1437's ameliorative revision of section 188, they implicitly propose we rewrite the legislation to expand its scope, a rarely used but nonetheless permissible judicial tool. (See, e.g., *Kopp v. Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 641 ["it is appropriate in some situations for courts to reform—i.e., 'rewrite'—enactments in order to avoid constitutional infirmity, when doing so 'is more consistent with legislative intent than the result that would attend outright invalidation.' . . .[L]ike the high court, we have reformed statutes to preserve their constitutionality in cases concerning classification otherwise invalid under the equal protection clause"].)

Both the federal and California Constitutions guarantee that no person shall be "den[ied] . . . the equal protection of the laws." (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7.) Equal protection of the laws simply means that similarly situated persons shall be treated in like manner unless there is a sufficiently good reason to treat them differently. (*People v. Morales* (2016) 63 Cal.4th 399, 408; *Engquist v. Oregon Dept. of*

---

constitutional questions if such an interpretation is fairly possible"]; *People v Garcia* (2017) 2 Cal.5th 792, 815 ["The canon of constitutional avoidance is a tool of statutory interpretation that permits us to select between competing plausible interpretations of statutory text. It does not permit us to ""do[] violence to the reasonable meaning of the language used"" [citation], nor does it provide 'a method of adjudicating constitutional questions by other means' [citation]"].) As discussed, the language of SB 1437 is unambiguous on this point and is not susceptible of the reading suggested by Lopez and Navarrete. Accordingly, we must directly confront the constitutional question they pose.

*Agriculture* (2008) 553 U.S. 591, 602 [128 S.Ct. 2146, 170 L.Ed.2d 975]; see *People v. Chatman* (2018) 4 Cal.5th 277, 289 ["our precedent has not distinguished the state and federal guarantees of equal protection for claims arising from allegedly unequal consequences with different types of criminal offenses"]; *Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 881 [federal and state equal protection guarantees have similar interpretation].)

The first step in evaluating any equal protection claim is determining whether there are two groups of individuals who are """"similarly situated with respect to the legitimate purpose of the law"""" but are being treated differently. (*People v. Barrett* (2012) 54 Cal.4th 1081, 1107; accord, *Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253 [to prevail on an equal protection challenge, a party must first establish that "'the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner'"]; *People v. Castel* (2017) 12 Cal.App.5th 1321, 1326.) If the two groups are not similarly situated or are not being treated differently, then there can be no equal protection violation.

If such a classification of similarly situated individuals exists, a court must next ascertain whether the Legislature has a constitutionally sufficient reason to treat the groups differently. (*People v. Chatman*, *supra*, 4 Cal.5th at p. 288; *In re Marriage Cases* (2008) 43 Cal.4th 757, 831.) Unless the groups are defined by word or effect as members of a "suspect classification" (such as race, national origin or gender) or the law affects a fundamental right (such as the right to vote or the right to marry), a law will be upheld as long as there is any "*rational* relationship between the disparity of treatment and some legitimate governmental purpose." (*Chatman*, at pp. 288-289; *Johnson v. Department of*

*Justice, supra*, 60 Cal.4th at p. 881.) "'This standard of rationality does not depend upon whether lawmakers ever actually articulated the purpose they sought to achieve. Nor must the underlying rationale be empirically substantiated. [Citation.] While the realities of the subject matter cannot be completely ignored [citation], a court may engage in "'rational speculation'" as to the justifications for the legislative choice [citation]. It is immaterial for rational basis review "whether or not" any such speculation has "a foundation in the record.'" . . . If a plausible basis exists for the disparity, courts may not second-guess its "'wisdom, fairness, or logic.'"'" (*Johnson*, at p. 881; see *Warden v. State Bar* (1999) 21 Cal.4th 628, 644 [when the challenged statutory classification of similarly situated individuals "neither proceeds along suspect lines nor infringes fundamental constitutional rights," it "must be upheld against [an] equal protection challenge *if there is any reasonably conceivable state of facts that could provide a rational basis for the classification*"].)

Lopez and Navarrete's equal protection argument fails each of these two necessary steps in the constitutional analysis.

a. *Individuals convicted of murder and those convicted of attempted murder under the natural and probable consequences doctrine are not similarly situated*

The first inquiry in an equal protection analysis "is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.'" (*Cooley v. Superior Court, supra*, 29 Cal.4th at p. 253; accord, *People v. Valencia* (2017) 3 Cal.5th 347, 376.) "Where two or more groups are properly distinguishable for purposes of the challenged law, it is immaterial if they are

29

indistinguishable in other respects." (*People v. Barrett*, *supra*, 54 Cal.4th at p. 1107.)

The aim of SB 1437, as clearly articulated in the Legislature's findings and declarations, is to effect "statutory changes to more equitably sentence offenders in accordance with their involvement in homicides." (Stats. 2018, ch. 1015, § 1, subd. (b).) The legitimacy of that legislative goal cannot seriously be questioned. For purposes of that appropriate legislative objective, those charged with, or found guilty of, murder are, by definition, not similarly situated with individuals who face other, less serious charges.

This distinction is not merely a matter of semantics: Murder and attempted murder are separate crimes. (See *People v. Marinelli* (2014) 225 Cal.App.4th 1, 5 ["[i]t is well established that "'[a]n attempt is an offense 'separate' and 'distinct' from the completed crime'"]; *People v. Lewis* (2006) 146 Cal.App.4th 294, 298 [same]; *People v. Reed*, *supra*, 129 Cal.App.4th at p. 1283 [same].) And murder is punished more severely than attempted murder. (Compare § 190, subd. (a) [penalty for first and second degree murder] with § 664 [penalty for attempted murder and attempted willful, deliberate and premeditated murder].) These different penal consequences necessarily mean, for purposes of sentencing reform, an individual charged with, or convicted of, murder under the natural and probable consequences doctrine is not similarly situated to an individual confronting a charge of attempted murder (or, possibly, only aggravated assault) under the doctrine. (Cf. *People v. Valencia*, *supra*, 3 Cal.5th at pp. 375-376 [individuals eligible for resentencing under Proposition 47 and Proposition 36 are not similarly situated; the two propositions operate with respect to "very different populations of

offenders"].)  The Legislature is permitted to treat these two groups of criminals differently.

> b. *The Legislature's limitation of SB 1437 to individuals convicted of murder under the natural and probable consequences doctrine is subject to rational basis review*

Personal liberty is a fundamental interest for purposes of equal protection analysis.  (*People v. Olivas* (1976) 17 Cal.3d 236, 251 ["personal liberty is an interest which is entitled to the same protection as other fundamental interests"]; see *In re Hop* (1981) 29 Cal.3d 82, 89.)  However, as the Supreme Court explained in *People v. Wilkinson* (2004) 33 Cal.4th 821 (*Wilkinson*), in which it applied rational basis review to uphold a statutory scheme permitting a defendant to be charged with violating section 243.1, which makes it a felony to commit battery on a custodial officer in the performance of his or her duties, while under section 243, subdivision (c)(1), the crime of battery on a custodial officer causing injury may be charged as either a misdemeanor or a felony:  "The language in *Olivas* could be interpreted to require application of the strict scrutiny standard whenever one challenges upon equal protection grounds a penal statute or statutes that authorize different sentences for comparable crimes, because such statutes always implicate the right to 'personal liberty' of the affected individuals.  Nevertheless, *Olivas* properly has not been read so broadly. . . .  'California courts have never accepted the general proposition that "all criminal laws, because they may result in a defendant's incarceration, are perforce subject to strict judicial scrutiny."'"  (*Wilkinson*, at p. 838; see *People v. Bell* (1996) 45 Cal.App.4th 1030, 1049 [a broad reading of *Olivas* would "intrude[] too heavily on the police power and the Legislature's prerogative to set criminal justice

policy"]; *People v. Mitchell* (1994) 30 Cal.App.4th 783, 796 ["[d]etermining gradations of culpability . . . does not implicate the strict scrutiny test for equal protection purposes"]; see also *People v. Silva* (1994) 27 Cal.App.4th 1160, 1167.)

Thus, in *Wilkinson*, *supra*, 33 Cal.4th at page 838 the Supreme Court held a defendant "'does not have a fundamental interest in a specific term of imprisonment or in the designation a particular crime receives.'" (Accord, *People v. K.P.* (2018) 30 Cal.App.5th 331, 343 [rejecting argument strict scrutiny review must be applied to constitutional challenge to exclusion of individuals found not guilty by reason of insanity from ameliorative provisions of legislation making imposition of formerly mandatory firearm-use enhancements discretionary; "where the issue is not whether a deprivation of an individual's liberty will occur, but rather the duration of that deprivation, rational basis review is appropriate"]; see *People v. Ward* (2008) 167 Cal.App.4th 252, 258 [applying rational basis review to a constitutional change to statutes imposing different penalties for possession for sale of cocaine base and cocaine powder].) As in *Wilkinson* and *K.P.*, the issue here is one of the Legislature's power to define crimes and fix penalties. We, therefore, apply rational basis review to determine whether the Legislature's limitation of the ameliorative provisions of SB 1437 was justified.

>   c. *A plausible basis exists for the Legislature's decision to provide relief only to accomplices convicted of murder under the natural and probable consequences doctrine*

A fundamental principle of rational-basis equal protection review, articulated by both the United States and California Supreme Courts, is "the propriety of a legislature's taking reform "'one step at a time, addressing itself to the phase of the problem

32

which seems most acute to the legislative mind.""" (*Kasler v. Lockyer* (2000) 23 Cal.4th 472, 488; accord, *Warden v. State Bar*, *supra*, 21 Cal.4th at p. 644 ["under the rational relationship test, the state may recognize that different categories or classes of persons within a larger classification may pose varying degrees of risk of harm, and properly may limit a regulation to those classes of persons as to whom the need for regulation is thought to be more crucial or imperative"]; see *Williamson v. Lee Optical Co.* (1955) 348 U.S. 483, 489 [75 S.Ct. 461, 99 L.Ed. 563] ["Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think"]; see also *Bowen v. Owens* (1986) 476 U.S. 340, 348 [106 S.Ct. 1881, 90 L.Ed.2d 316] [Congress may chose to proceed cautiously, rather than taking an all-or-nothing approach to addressing a complex problem].)

There may well be sound policy reasons for the Legislature to adopt ameliorative provisions like those in SB 1437 for individuals charged with, or convicted of, attempted murder under the natural and probable consequences doctrine. But the Legislature's decision to limit sentencing reform at this time to offenders in cases of murder is certainly rational. First, the gap between a defendant's culpability in aiding and abetting the target offense and the culpability ordinarily required to convict on the nontarget offense is greater in cases where the nontarget offense is murder, than where the nontarget offense is attempted murder or, in the prosecutor's discretion, aggravated assault. The Legislature could have reasonably concluded reform in murder cases "was more crucial or imperative." (See *Wilkinson*, *supra*, 33 Cal.4th at p. 840 ["[t]he Legislature is responsible for

33

determining which class of crimes deserves certain punishments and which crimes should be distinguished from others"].)

Second, the process created in section 1170.95 for those convicted of felony murder or murder under a natural and probable consequences theory to petition the sentencing court to vacate that conviction and to be resentenced is not cost-free. The staff of the Senate Appropriations Committee estimated, if 10 percent of the inmates eligible for relief under SB 1437 petitioned the courts for resentencing, additional court workload costs would approximate $7.6 million.[13] The Committee's report expressed concern that this increase in workload "could result in delayed court services and would put pressure on the General Fund to fund additional staff and resources." (Sen. Com. Appropriations Report, p. 3.) Additional expenditures would also be required to transport petitioners in custody to and from court hearings. (*Ibid.*)

In a world of limited resources, it is reasonable for the Legislature to limit the scope of reform measures to maintain the state's financial integrity. (See *People v. Chatman*, *supra*, 4 Cal.5th at p. 290 ["[p]reserving the government's financial integrity and resources is a legitimate state interest"]; see also *American Bank & Trust Co. v. Community Hospital* (1984) 36 Cal.3d 359, 374 [Legislature has broad leeway in making economic line-drawing determinations]; *People v. Cruz* (2012)

---

[13] In reaching this conclusion the committee staff assumed it would take the superior court an average of four hours to adjudicate a petition from receipt to final order. (Sen. Com. Appropriations Report, p. 3.) Additional judicial branch costs that would be incurred if the superior court's decision was appealed were not considered.

34

207 Cal.App.4th 664, 679 [prospective application of 2011 realignment legislation was "necessary so as not to overwhelm trial court resources by requiring the resentencing of numerous inmates," a legitimate state interest].)

In sum, the distinction drawn by SB 1437 between individuals charged with, or convicted of, murder and attempted murder under the natural and probable consequences doctrine does not violate equal protection.

4. *Whether Lopez's and Navarrete's Convictions for Murder Are Properly Vacated Must Be Determined in the First Instance by the Sentencing Court*

We have considered the effect of SB 1437 on Lopez's and Navarrete's convictions for murder and attempted premeditated murder because the Supreme Court instructed us to do so when it transferred the cause to us pursuant to California Rules of Court, rule 8.528. However, whether Lopez and Navarrete are actually entitled to the benefits of SB 1437 (that is, to have their convictions for murder vacated and to be resentenced on the remaining offenses) must be considered in the first instance by the trial court, following remand, pursuant to the procedures created by section 1170.95, not on direct appeal. (*People v. Anthony*, *supra*, 32 Cal.App.5th at p. 152; *People v Martinez* (2019) 31 Cal.App.5th 719, 727 (*Martinez*).)

a. *The Estrada rule does not apply when the Legislature has not remained silent on the question of retroactivity*

As thoroughly and persuasively analyzed by our colleagues in Division Five of this court in *Martinez, supra*, 31 Cal.App.5th 719, the question of our ability to implement SB 1437 on direct appeal from nonfinal convictions obtained prior to the effective date of the legislation is analytically indistinguishable from the

comparable issue under Proposition 36 (the Three Strikes Reform Act of 2012), considered by the Supreme Court in *People v. Conley* (2016) 63 Cal.4th 646, and Proposition 47 (the Safe Neighborhoods and Schools Act), addressed in *People v. DeHoyos* (2018) 4 Cal.5th 594. In *Conley* the Court explained that the rule of *In re Estrada* (1965) 63 Cal.2d 740, which presumes that newly enacted legislation lessening a criminal punishment is intended to apply to all cases not yet reduced to final judgment on the statute's effective date, "rests on an inference that, in the absence of contrary indications, a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not." (*Conley*, at p. 657.) However, when the enacting body creates a specific mechanism for retroactive application of the new lesser punishment to individuals who have previously been sentenced, as was true with both Proposition 36 and Proposition 47, the *Estrada* presumption does not automatically apply. (*Conley*, at p. 658; see *DeHoyos*, at p. 602.) Accordingly, after analyzing the special statutory remedies created by Proposition 36 and Proposition 47 for defendants to use to seek resentencing based on the changes in the law, the Court in *Conley* and *DeHoyos* held those procedures were exclusive; relief was not available on direct appeal. (*Conley*, at pp. 652, 661-662; *DeHoyos*, at p. 603.)

As was true with Proposition 36 and Proposition 47, SB 1437 is not silent on the question of retroactivity. Rather, like the two propositions, SB 1437 provides specific retroactivity rules in section 1170.95, which require a determination of the defendant's entitlement to relief to be made by the sentencing court. (*Martinez, supra*, 31 Cal.App.5th at p. 727.) "The

petitioning procedure specified in that section applies to persons who have been convicted of felony murder or murder under a natural and probable consequences theory.  It creates a special mechanism that allows those persons to file a petition in the sentencing court seeking vacatur of their conviction and resentencing.  In doing so, section 1170.95 does not distinguish between persons whose sentences are final and those whose sentences are not.  That the Legislature specifically created this mechanism, which facially applies to both final and nonfinal convictions, is a significant indication Senate Bill 1437 should not be applied retroactively to nonfinal convictions on direct appeal." (*Ibid.*; accord, *People v. Anthony, supra,* 32 Cal.App.5th at p. 1152.)

The similarities between the postconviction procedures provided in Propositions 36 and 47 and those in section 1170.95 include the authority of the trial court, upon the requisite evidentiary showing, to deny relief to the defendant.  In the case of Proposition 36 and Proposition 47, a factual finding the defendant poses an unreasonable risk of danger to public safety disentitles him or her to relief.  (See §§ 1170.18, subd. (b), 1170.126, subd. (f).)  Under section 1170.95 relief must be denied if the People establish, either based on the record of conviction or through new or additional evidence, that the defendant personally acted with malice.  (§ 1170.95, subd. (d)(3).) "Providing the parties with the opportunity to go beyond the original record in the petition process, a step unavailable on direct appeal, is strong evidence the Legislature intended for persons seeking the ameliorative benefits of [SB 1437] to proceed via the petitioning process." (*Martinez, supra,* 31 Cal.App.5th at p. 728.)

37

b. *Requiring defendants to seek relief pursuant to section 1170.95 does not deprive them of their right to a jury trial*

Requiring Lopez and Navarrete to pursue relief in the trial court pursuant to section 1170.95, where the trial court can determine they remain liable for murder if the People establish beyond a reasonable doubt they personally acted with malice, does not, as they contend, deprive them of their constitutional right to a jury trial under *Apprendi v. New Jersey* (2000) 530 U.S. 466 [120 S.Ct. 2348, 147 L.Ed.2d 435] and *Alleyne v United States* (2013) 570 U.S. 99 [133 S.Ct. 2151, 186 L.Ed.2d 314]:[14] "[T]he retroactive relief they are afforded by Senate Bill 1437 is not subject to Sixth Amendment analysis.  Rather, the Legislature's changes constituted an act of lenity that does not implicate defendants' Sixth Amendment rights." (*People v. Anthony*, *supra*, 32 Cal.App.5th at pp. 1156-1157; see *People v. Perez* (2018) 4 Cal.5th 1055, 1063-1064 [trial court may determine facts based on new evidence regarding the petitioner's eligibility for resentencing under Proposition 36 because retroactive application of the benefits from the proposition are a legislative act of lenity that does not implicate Sixth Amendment rights; "a factual finding that results in resentencing ineligibility

---

[14]     The Supreme Court in *Apprendi v. New Jersey, supra,* 530 U.S. at page 490, held any fact other than a prior conviction that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury and proved beyond a reasonable doubt.  In *Alleyne v. United States, supra,* 570 U.S. at page 108, it held any fact that increases the mandatory minimum penalty for a crime also must be submitted to a jury and proved beyond a reasonable doubt.

does not increase the petitioner's sentence; it simply leaves the original sentence intact"].)

### c. *Requiring defendants to seek relief pursuant to section 1170.95 does not violate section 654*

Relying on language in section 654, subdivision (a), that "[a]n acquittal or conviction and sentence under any one [provision of law] bars a prosecution for the same act or omission under any other," Lopez and Navarrete argue the People should not be given the opportunity to prove their liability for murder under a direct aiding and abetting theory in a section 1170.95 proceeding after they were tried and convicted of murder solely under the now legally untenable natural and probable consequences doctrine. In support of their contention Lopez and Navarrete quote *Kellett v. Superior Court* (1966) 63 Cal.2d 822, 827 (*Kellett*), which held, when "the prosecution is or should be aware of more than one offense in which the same act or course of conduct plays a significant part, all such offenses must be prosecuted in a single proceeding unless joinder is prohibited or severance permitted for good cause. Failure to unite all such offenses will result in a bar to subsequent prosecution of any offense omitted if the initial proceedings culminate in either acquittal or conviction and sentence." (See also *People v. Goolsby* (2015) 62 Cal.4th 360, 362.)

In *Kellett*, however, the Supreme Court was concerned with a new prosecution for an offense, based on the same act or conduct as an earlier prosecution, that was not previously considered by the jury (see *Kellett*, *supra*, 63 Cal.2d at pp. 826-827), not with the viability of alternative theories for the same substantive offense. Where, as here, a conviction is not reversed on appeal for insufficient evidence but because of a retroactive

39

change in the law, neither section 654 nor constitutional prohibitions against double jeopardy prevent a retrial. (See *Chiu, supra*, 59 Cal.4th at p. 168 [allowing the People to retry charge of first degree murder on a direct aiding and abetting theory when jury may have improperly based prior verdict on natural and probable consequences doctrine]; see also *People v. Gutierrez* (2018) 20 Cal.App.5th 847, 857 [permitting new trial on charge of unauthorized taking of an automobile when evidence of value of automobile not introduced at original trial and Supreme Court had not yet ruled on Proposition 47's applicability to Vehicle Code section 10851]; *People v. Figueroa* (1993) 20 Cal.App.4th 65, 71-72, fn. 2 [permitting new trial where statutory amendments added new element to offense after original trial].)

In any event, a remand to permit Lopez and Navarrete to petition for relief under section 1170.95 involves a resentencing procedure, not a new prosecution. Section 654 and the cases interpreting it are simply inapplicable in this context.

> 5. *The Trial Court Properly Instructed the Jury That Lopez and Navarrete Could Be Convicted of Attempted Premeditated Murder Under the Natural and Probable Consequences Doctrine*[15]

The People's theory of the case was that Lopez, Navarrete and Martinez conspired to commit vandalism and that Ordonez's murder and the attempted murder of Baquiax were the natural and probable consequences of that conspiracy, making Lopez and

---

[15] Because Lopez's and Navarrete's convictions for second degree murder under the natural and probable consequences doctrine are no longer legally viable, we limit our consideration of the issues originally raised on appeal to their challenges to the remaining charges and sentencing enhancements.

Navarrete liable for Martinez's commission of the more serious crimes.

The trial court instructed the jury pursuant to CALCRIM No. 416 on the elements of conspiracy to commit vandalism and for determining whether Lopez and Navarrete were members of the conspiracy. The trial court then instructed pursuant to CALCRIM No. 417 on liability for coconspirators' acts under the natural and probable consequences doctrine: "A member of a conspiracy is criminally responsible for the crimes that he or she conspires to commit, no matter which member of the conspiracy commits the crime. [¶] A member of a conspiracy is also criminally responsible for any act of any member of the conspiracy if that act is done to further the conspiracy and that act is a natural and probable consequence of the common plan or design of the conspiracy. This rule applies even if the act was not intended as part of the original plan. Under this rule, a defendant who is a member of the conspiracy does not need to be present at the time of the act.

"A *natural and probable consequence* is one that a reasonable person in the defendant's position would have or should have known was likely to happen if nothing unusual intervened. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.

"A member of a conspiracy is not criminally responsible for the act of another member if that act does not further the common plan or is not a natural and probable consequence of the common plan.

[¶] . . . [¶]

41

"The defendant is not responsible for the acts of another person who was not a member of the conspiracy even if the acts of the other person helped accomplish the goal of the conspiracy. [¶] A conspiracy member is not responsible for the acts of other conspiracy members that are done after the goal of the conspiracy had been accomplished."

Navarrete and Lopez contend the trial court erred in giving this instruction "because our courts have determined that a coconspirator is not criminally liable for the crimes committed by another coconspirator when the connection between the conspirator's conduct and the perpetrator's conduct and mental state [is] too attenuated; when there are severe penalty differences between the intended target crime (in this case, the general intent crime of misdemeanor vandalism) and the unintended crimes (in this case, the specific intent crimes of murder and attempted murder); and because of the rationale underlying the natural and probable consequences doctrine." None of their claims has merit.

### a. *Attenuation of connection between a coconspirator's and the perpetrator's premeditative mental state*

As mandated by *Chiu*, *supra*, 59 Cal.4th 155, the trial court in this case properly instructed the jury, if it found Ordonez's murder was a natural and probable consequence of the charged conspiracy to commit vandalism, Lopez and Navarrete would be liable for second degree murder only. By parity of reasoning, Lopez and Navarrete contend, it was error to instruct the jury they could be found guilty of attempted premeditated murder under the natural and probable consequences doctrine because an aider and abettor's or coconspirator's culpability and the connection between the premeditative mental state of the

42

perpetrator are as attenuated in an attempted premeditated murder case as in the case of first degree premeditated murder considered in *Chiu*.

We acknowledge the logic of this argument. Attempted premeditated murder, like attempted murder, requires a direct but ineffective step toward killing another person with the specific intent to kill that person (CALCRIM No. 600), but has the additional elements of willfulness, premeditation and deliberation that, as with murder itself, trigger a heightened penalty. Nonetheless, in *People v. Favor* (2012) 54 Cal.4th 868, the Supreme Court held, "Under the natural and probable consequences doctrine, there is no requirement that an aider and abettor reasonably foresee an attempted premeditated murder as the natural and probable consequence of the target offense. It is sufficient that attempted murder is a reasonably foreseeable consequence of the crime aided and abetted, and the attempted murder itself was committed willfully, deliberately and with premeditation." (*Id.* at p. 880.) In *Chiu* the Supreme Court did not question the continued viability of *Favor*, and instead simply distinguished it. (*Chiu*, *supra*, 59 Cal.4th at p. 163.) We are bound by the holding in *Favor*. (*People v. Johnson* (2012) 53 Cal.4th 519, 527-528.)[16]

---

[16] In *People v. Mateo*, *supra*, S232674, the Supreme Court had indicated its intention to reconsider the continued viability of *Favor* in light of its decision in *Chiu* and the United States Supreme Court's decision in *Alleyne v. United States*, *supra*, 570 U.S. 99. However, the Court transferred *Mateo* to the court of appeal in March 2019 with instructions to vacate its prior opinion and consider the effect, if any, of SB 1437 on the case. *Favor* thus remains binding authority.

b. *The discrepancy between the penalties for the target and nontarget offenses*

Lopez and Navarrete also contend it was error to utilize the natural and probable consequences doctrine in this case because of the severe penalty differences between misdemeanor vandalism, the object of the alleged conspiracy, on the one hand, and attempted premeditated murder, on the other hand. Although the Supreme Court in *Chiu*, when discussing the attenuated nature of the connection between the aider and abettor's culpability and the perpetrator's premeditative state, referred to "the severe penalty" for first degree premeditated murder (*Chiu, supra*, 59 Cal.4th at p. 166), the Court did not suggest that disparity in penalties was a basis for not applying the natural and probable consequences doctrine.

To be sure, the court of appeal in *People v. Montes* (1999) 74 Cal.App.4th 1050, evaluating the defendant's challenge to an instruction he could be convicted of attempted murder on a natural and probable consequence theory for aiding and abetting simple assault or breach of the peace for fighting in public, conceded "it is rarely, if ever, true that 'an aider and abettor can "become liable for the commission of a very serious crime" committed by the aider and abettor's confederate [where] "the target offense contemplated by his aiding and abetting [was] trivial."' [Citation.] 'Murder, for instance, is *not* the natural and probable consequence of trivial activities. To trigger application of the "natural and probable consequences" doctrine, there must be a close connection between the target crime aided and abetted and the offense actually committed.'" (*Id.* at p. 1055.) On the record before it, however, the *Montes* court concluded the target offenses of simple assault and breach of the peace for fighting in

44

public were not trivial. "They arose in the context of an ongoing rivalry between [criminal street gangs] during which the two gangs acted violently toward each other." (*Ibid*.) The gang expert explained that "these facts represent a textbook example of how a gang confrontation can easily escalate from mere shouting and shoving to gunfire. [The court concluded t]here can be little question that the target offenses of assault and breach of the peace were closely connected to the shooting." (*Ibid*.)

This case is similar. While misdemeanor vandalism, in and of itself, may be relatively trivial, the jury could reasonably conclude under the circumstances of this case it was not. Lopez, Navarrete and Martinez went into rival gang territory to spray graffiti, including markings that disparaged and disrespected the rival gang. Officer Hernandez testified not only that infiltrating another gang's territory is an aggressive sign of disrespect but also that gang members engaged in that activity could expect rival gang members to react with violence. For this reason, Officer Hernandez explained, a gang member putting up graffiti in rival territory would go with a group, which might include a getaway driver and a shooter in case there was a violent confrontation. Based on that testimony, misdemeanor vandalism could properly be seen as a target crime that would naturally, probably and foreseeably result in a murder. (See *Chiu*, *supra*, 59 Cal.4th at p. 166.)

6. *Substantial Evidence Supports the Finding That the Attempted Murder of Baquiax Was the Natural and Probable Consequence of the Conspiracy To Commit Vandalism*

In evaluating Lopez and Navarrete's contention the evidence is insufficient to support their convictions for attempted

45

murder under the natural and probable consequences doctrine, "we review the record 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence— that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Westerfield* (2019) 6 Cal.5th 632, 713.)  In applying this test, we "presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.]  'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.  [Citation.]'  [Citation.]  A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; accord, *People v. Penunuri* (2018) 5 Cal.5th 126, 142.)  "'Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal.'" (*People v. Clark* (2016) 63 Cal.4th 522, 626; accord, *People v. Ghobrial* (2018) 5 Cal.5th 250, 277.)

   In support of their contention there was insufficient evidence to support the finding the attempted premeditated murder of Baquiax was a natural and probable consequence of conspiracy to commit misdemeanor vandalism, Lopez and

Navarrete principally rely on *People v. Leon* (2008)
161 Cal.App.4th 149.  In that case Leon and a second gang
member had been breaking into vehicles in the parking lot of an
apartment complex when the brother of a car owner saw them
and said he was going to call the police.  The second gang
member looked at him and fired a gun into the air.  (*Id.* at
pp. 153-154.)  Leon was convicted of burglary, possession of a
concealed weapon and, on an aiding and abetting theory, witness
intimidation.  (*Id.* at pp. 155-156.)  On appeal he argued there
was insufficient evidence to support his conviction of witness
intimidation under the natural and probable consequences
doctrine.  (*Id.* at pp. 159-160.)

The court of appeal reversed the conviction for witness
intimidation.  Explaining its decision, the court observed, "Cases
involving the natural and probable consequences doctrine
frequently 'involve[] situations in which a defendant assisted or
encouraged a confederate to commit an assault with a deadly
weapon or with potentially deadly force, and the confederate not
only assaulted but also murdered the victim.'"  (*People v. Leon*,
*supra*, 161 Cal.App.4th at p. 160.)  Courts have also "'applied the
"natural and probable consequences" doctrine in situations where
a defendant assisted in the commission of an armed robbery,
during which a confederate assaulted or tried to kill one of the
robbery victims.'"  (*Ibid.*)  But in no published decision, the court
continued, had the crime of witness intimidation been found to be
the natural and probable consequence of vehicle burglary or
illegal possession of a weapon.  "There is not 'a close connection'
between any of the target crimes [the defendant] aided and
abetted, and [the perpetrator's] commission of witness
intimidation."  (*Id.* at p. 161.)  Even though the crimes were

gang-related and were committed in a rival gang's territory, which increased the possibility that violence would occur, the court concluded "witness intimidation cannot be deemed a natural and probable consequence of any of the target offenses." (*Ibid.*)

Analogizing the facts in the case at bar to those in *Leon*, Lopez and Navarrete contend Martinez's shooting of the church volunteers was not only unforeseeable in the abstract, but also unforeseeable as a practical matter because it was unnecessary and entirely unexpected. Lopez and Navarrete's argument ignores the significant fact that Leon was not convicted of a crime of violence—aggravated assault or attempted murder—based on the second gang member's discharge of a firearm during the vehicle burglaries; he was convicted of witness intimidation. (*People v. Leon, supra*, 161 Cal.App.4th at p. 157; see § 136.1.) That nontarget offense did not simply require proof of a foreseeable violent response to a confrontation over gang activity, but rather the anticipation that, if a bystander threatened to report the crime, the second gang member would attempt to prevent him from doing so—a more complex series of events.

Here, as discussed, Lopez, Navarrete and Martinez went into rival gang territory to spray graffiti, including markings mocking the rival gang. Officer Hernandez, the gang expert, testified infiltrating another gang's territory is an aggressive sign of disrespect and the graffiti crew would expect rival gang members to react to the intrusion with violence. For that reason, a gang member putting up graffiti in rival territory would likely go with a group that included, as here, a getaway driver and a shooter in case there was a confrontation. Based on this testimony and the evidence of Martinez's and Navarrete's actions

48

after Acosta confronted Lopez, and Ordonez and Baquiax appeared on the scene, the jury could reasonably find that Lopez and Navarrete each should have foreseen the possibility that someone would attempt to stop Lopez from putting up graffiti and the vandalism conspirators (including Martinez) were prepared to react to such interference with force. That the threat to Lopez actually came from church volunteers, not rival gang members, does not make the shooting any less foreseeable. Lopez, Navarrete and Martinez were prepared for opposition to the vandalism; when it materialized, they reacted in a reasonably foreseeable manner.

### 7. *The Instruction on the Kill Zone Theory of Attempted Murder Was Harmless Error*

#### a. *The court's duty to instruct only on theories supported by substantial evidence*

The trial court has the duty to instruct the jury "'on the general principles of law relevant to the issues raised by the evidence.'" (*People v. Smith* (2013) 57 Cal.4th 232, 239.) The court "'has the correlative duty "to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues."'" (*People v. Alexander* (2010) 49 Cal.4th 846, 920.)

When a jury has been instructed on a factual theory unsupported by substantial evidence, the error is one of state law "subject to the reasonable probability standard of harmless error under *People v. Watson* (1956) 46 Cal.2d 818, 836-836 . . . ." (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 214.) That is, reversal is not required "unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury

49

in fact found the defendant guilty solely on the unsupported theory." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1130; accord, *People v. McCloud* (2012) 211 Cal.App.4th 788, 803-804.)

### b. *The kill zone theory of attempted murder*

"'Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.'" (*People v. Sánchez* (2016) 63 Cal.4th 411, 457; accord, *People v. Canizales* (2019) 7 Cal.5th 591, 602 (*Canizales*).) As the Supreme Court explained in *People v. Bland* (2002) 28 Cal.4th 313, 328, "Someone who in truth does not intend to kill a person is not guilty of that person's attempted murder even if the crime would have been murder—due to transferred intent—if the person were killed. To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else." Under limited circumstances, however, a defendant who targets a specific person by firing indiscriminately at a crowd may be convicted of attempted murder if the evidence shows he or she intended to kill everyone in the targeted victim's vicinity in order to strike the original intended victim. (*Id.* at p. 330 ["[w]here the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone"].) The Supreme Court recently cautioned that trial courts "must be extremely careful in determining when to permit the jury to rely upon the kill zone theory." (*Canizales*, at p. 597.) "[T]he kill zone theory for establishing the specific intent to kill required for conviction of attempted murder may properly be applied only when a jury concludes: (1) the circumstances of the defendant's attack on a primary target, including the type and

extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target; and (2) the alleged attempted murder victim who was not the primary target was located in the zone of harm.  Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*Id.* at p. 607.)

Here, the trial court instructed the jury pursuant to CALCRIM No. 600:  "The defendants are charged in Count Two with Attempted Murder.  [¶]  To prove that the defendant is guilty of attempted murder, the People must prove that:  [¶] 1.  The defendant took at least one direct but ineffective step toward killing another person; [¶] AND [¶]  2.  The defendant intended to kill that person.  [¶]  . . .  [¶]  A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.'  In order to convict the defendant of the attempted murder of Santos Baquiax, the People must prove that the defendant not only intended to kill Andres Ordonez, but also either intended to kill Santos Baquiax or everyone within the kill zone.  If you have a reasonable doubt whether the defendant intended to kill Santos Baquiax by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Santos Baquiax."  Lopez and Navarrete contend it was error to give this

51

instruction because it included the kill zone theory, which was not supported by substantial evidence.[17]

The court, however, also instructed the jury pursuant to CALCRIM No. 200 that "[s]ome of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them."

### c. *The court's erroneous instruction did not prejudice Lopez or Navarrete*

The evidence at trial established that, as Baquiax and Ordonez first appeared and approached Lopez and Acosta, Lopez ran to the waiting BMW, and Martinez got out of the car and fired three or four shots in the direction of Baquiax and Ordonez. At that point Baquiax was about six feet from Acosta, and Ordonez about 12 feet away from him. Nothing about this factual scenario supports an inference that Martinez targeted Ordonez and shot at everyone in his immediate vicinity to ensure Ordonez was killed. Rather, the evidence supports the conclusion Martinez aimed at both Ordonez and Baquiax, intending to kill each of them for attempting to assist Acosta or apprehend Lopez.

---

[17] Although Lopez and Navarrete did not object to the kill zone instruction, we review any claim of instructional error that allegedly affects the defendants' substantial rights even in the absence of an objection. (§ 1259; *People v. Smithey* (1999) 20 Cal.4th 936, 976-977, fn. 7.) We can only determine if the defendants' substantial rights were affected by deciding whether the instruction was given in error and, if so, whether the error was prejudicial.

52

This is essentially what the prosecutor argued to the jury—that Martinez intended to kill both men, but "Mr. Baquiax was lucky enough to live."

Lopez and Navarrete assert the kill zone instruction was unsupported by the evidence and necessarily prejudicial because it was the only theory of attempted murder presented to the jury. Although they are correct the attempted murder instruction improperly included the kill zone theory, it did more than that: The jury was instructed the nontarget offense of attempted murder had been committed if the People proved "the defendant not only intended to kill Andres Ordonez, but also either intended to kill Santos Baquiax or everyone within the kill zone." As discussed, the evidence supported a finding of intent to kill both Ordonez and Baquiax. The prosecutor did not argue or rely on the kill zone theory, and the jury was directed to ignore instructions that did not apply to the facts as it found them. Under these circumstances it is not reasonably probable the jury convicted Lopez and Navarrete of the attempted murder of Baquiax based "solely on the unsupported theory." (*People v. Guiton*, *supra*, 4 Cal.4th at p. 1130; accord, *People v. McCloud*, *supra*, 211 Cal.App.4th at pp. 803-804.)[18]

---

[18] In *Canizales*, *supra*, 7 Cal.5th 591 the Supreme Court held, under the circumstances of that case, instructing the jury on the kill zone theory as indicated in CALCRIM No. 600 without sufficient evidence in the record to support the instruction was federal constitutional error, not state court error governed by *People v. Guiton*, *supra*, 4 Cal.4th 1116 and reviewed for prejudice under the *Watson* standard. The Court explained, because the instruction did not include a clear definition of the theory and the prosecutor's closing argument had a potential to mislead the jury to believe the mere presence of a purported

8. *Substantial Evidence Supports the Criminal Street Gang Findings*

Lopez and Navarrete challenge the jury's findings they committed the crimes for the benefit of a criminal street gang, arguing the People failed to prove the gang members who had committed the predicate offenses were members of the same gang subset as Lopez and Navarrete, as required by *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*), and the evidence on which the gang expert relied was not competent under *People v. Sanchez* (2016) 63 Cal.4th 665.  Neither challenge to the sufficiency of the evidence for the gang findings has merit.

a. <u>*Prunty*</u>

To obtain a true finding on an allegation of a criminal street gang enhancement, the People must prove the crime at issue was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang

---

victim in an area in which he or she could be fatally shot was sufficient for attempted murder liability, there was a reasonable likelihood the jury understood the kill zone theory in a legally impermissible manner.  (*Canizales*, at p. 614.)  Here, in contrast, the prosecutor did not mention the kill zone theory in closing argument; and error is properly viewed as involving an instruction on an alternative theory that is not factually supported by the evidence adduced at trial, which "the jury is fully equipped to detect."  (*Guiton*, at p. 1129.)  But even if giving the kill zone instruction were federal constitutional error, in light of the strength of the evidence that Martinez intended to kill both Ordonez and Baquiax, we would find "'it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error.'"  (*Canizales*, at p. 615.)

members." (§ 186.22, subd. (b)(1).) A "criminal street gang" is defined as an organization that has as one of its primary activities the commission of one or more of the crimes enumerated in section 186.22, subdivision (e), and whose members have engaged in a "pattern of criminal gang activity" by committing two or more of such "predicate offenses" on separate occasions or by two or more persons within a three-year period. (§ 186.22, subds. (e), (f); *People v. Loeun* (1997) 17 Cal.4th 1, 9.)

In *Prunty* the defendant argued the People failed to introduce sufficient evidence to prove that he had committed the underlying offenses for the benefit of a criminal street gang, challenging the prosecution's theory the relevant ongoing organization, association or group was the gang known as the Norteños in general. (*Prunty*, *supra*, 62 Cal.4th at p. 70.) Specifically, the defendant contended "the prosecution's use of crimes committed by various Norteño subsets to prove the existence of a single Norteño organization . . . improperly conflated multiple separate street gangs into a single Norteño gang without evidence of 'collaborative activities or collective organizational structure' to warrant treating those subsets as a single entity." (*Ibid.*)

The Supreme Court agreed, holding, "[W]here the prosecution's case positing the existence of a single 'criminal street gang' for purposes of section 186.22(f) turns on the existence and conduct of one or more gang subsets, then the prosecution must show some associational or organizational connection uniting those subsets. That connection may take the form of evidence of collaboration or organization, or the sharing of material information among the subsets of a larger group. Alternatively, it may be shown that the subsets are part of the

same loosely hierarchical organization, even if the subsets themselves do not communicate or work together. And in other cases, the prosecution may show that various subset members exhibit behavior showing their self-identification with a larger group, thereby allowing those subsets to be treated as a single organization." (*Prunty*, *supra*, 62 Cal.4th at p. 71; see *id*. at p. 81 ["the prosecution must show that the group the defendant acted to benefit, the group that committed the predicate offenses, and the group whose primary activities are introduced, is one and the same"].)

Officer Hernandez testified the Rockwood Street gang had subsets or cliques that included Westmoreland and K.T.O. Members of the separate cliques of Rockwood were all members of the same gang and were simply divided by location. The various cliques used common gang symbols and hand signs, and it was common for members of two cliques to conduct joint activities.

Officer Hernandez also testified the gang's primary activities were murder, attempted murder, robbery and extortion. Richard Alvarez, a Rockwood Street member known as Shaggy or Shadow, was convicted of a murder committed in 2007. Rodrigo Bernal, a Rockwood Street member known as Scooby or Woody, was convicted of a murder committed in 2008.

The trial court asked Officer Hernandez specifically whether there was "some kind of associational connection" between the Westmoreland and K.T.O. sets, noting that "[s]ome gangs with actual subsets could actually be rivals, correct?" Hernandez agreed that was the case "[f]or some," but "[i]n Rockwood they're—none of the cliques are against each other at all." The court then asked, "So what I want to know is what's the

associational relationship between these two different cliques as well as others of Rockwood?"  Hernandez responded, "As far as like the Westmorelands since that block is—nobody really hangs out there.  Those that are from Westmoreland come over here to hang out with the cliques on our side of the . . . Rampart Division."  In response to further questioning, he explained that Westmoreland and K.T.O. had their own hierarchies, but they were part of the common organization, not completely separate.

The court also asked Officer Hernandez, "How does that organizational composition interact?"  The officer answered, "Well, they all hang out together.  The people that we have suspected of being in charge of running that clique don't always come out and talk to us but we are told and from information we've gathered that they do hang out and they do conduct their business all as one."

Lopez and Navarrete contend this evidence was not sufficient for the jury to find the required associational or organizational connections among Rockwood Street, Westmoreland and K.T.O.  Additionally, they argue the People's evidence of primary activities and predicate crimes did not prove the specified murders had been committed as part of criminal gang activity because there was no evidence as to the subsets, if any, to which the perpetrators (Bernal and Alvarez) belonged and, thus, no way to link the Westmoreland and K.T.O. subsets to the Rockwood gang.

A comparison of the gang evidence in this case and that in *Prunty* exposes the flaws in Lopez and Navarrete's argument.  In *Prunty* the defendant was an admitted member of the Detroit Boulevard Norteño set.  (*Prunty*, *supra*, 62 Cal.4th at p. 68.)  The gang expert "testified that the Norteños are 'a Hispanic street

57

gang active in Sacramento and throughout California' with about 1,500 local members." (*Id*. at p. 69.) The "Sacramento-area Norteños are not associated with any particular 'turf' but are instead 'all over Sacramento' with 'a lot of subsets based on different neighborhoods.'" (*Ibid*.) The expert also described the primary activities of Sacramento-area Norteños and the common names, signs, symbols and color of the Norteños. (*Ibid*.) The expert identified the Norteños' enemy as the Sureño street gang, which had its own letters, number and color. (*Ibid*.) He explained that "[b]oth the Norteños and the Sureños 'originated out of the California prison systems' in the 1960's and 1970's. The Sureños are associated with the Mexican Mafia prison gang, while the Norteños have a 'street gang association' with the Nuestra Familia, or NF, prison gang." (*Ibid*.)

The gang expert in *Prunty* "described a 2007 confrontation between two Norteño gang subsets, the Varrio Gardenland Norteños and the Del Paso Heights Norteños, that led to two Varrio Gardenland members' convictions for a variety of offenses, including murder and attempted murder. [He also] testified about a 2010 incident in which members of the Varrio Centro Norteños shot at a former Norteño gang member. Besides [the expert's] testimony that these gang subsets referred to themselves as Norteños, the prosecution did not introduce specific evidence showing these subsets identified with a larger Norteño group. Nor did [the expert] testify that the Norteño subsets that committed the predicate offenses shared a connection with each other, or with any other Norteño-identified subset." (*Prunty*, *supra*, 62 Cal.4th at p. 69.)

The Supreme Court found that "where the prosecution's evidence fell short is with respect to the predicate offenses. [The

expert] referred to two offenses involving three alleged Norteño subsets . . . .  Although [the expert] characterized these groups as Norteños, he otherwise provided no evidence that could connect these groups to one another, or to an overarching Sacramento-area Norteño criminal street gang. . . .” (*Prunty*, *supra*, 62 Cal.4th at p. 82.)  In addition, the expert’s testimony did not “demonstrate that the subsets that committed the predicate offenses, or any of their members, self-identified as members of the larger Norteño association that the defendant sought to benefit.  Although there was ample evidence that [the defendant] self-identified as both a member of the Detroit Boulevard Norteños and the larger umbrella Norteño gang, and that he collaborated with a member of another subset to commit his present offenses, the prosecution presented no evidence that the members of the Varrio Gardenland and Varrio Centro Norteños self-identified as part of the umbrella Norteño gang.” (*Id*. at pp. 82-83.)

Here, in contrast, Officer Hernandez’s testimony established Rockwood Street had a relatively small number of members and a discrete territory.  The cliques were not separate entities, but acted as parts of a common organization whose members spent significant amounts of time with one another.  Thus, the jury had evidence from which it could reasonably find that acts by members of any particular subset of Rockwood Street were intended to benefit the larger gang itself.  (See *Prunty*, *supra*, 62 Cal.4th at p. 83 [the prosecution needed to present evidence from which the jury could “connect the subsets that committed the predicate offenses to the larger Norteño group the prosecution claimed [the defendant] acted to benefit”]; *People v. Resendez* (2017) 13 Cal.App.5th 181, 191 [“the prosecution in

*Prunty* provided *no* evidence of a connection between the defendant's gang and the subsets that committed the predicate offenses.  [Citation.]  In contrast, here there was testimony showing contacts among the Locos (defendant's subset) and Rascals (subset of the perpetrators of the predicate offenses), and showing they all self-identified with the East Side Bolen gang"]; *People v. Garcia* (2017) 9 Cal.App.5th 364, 378 ["there is a plethora of evidence that the Bittys and the Jungles subsets self-identified as part of the Black P-Stones and 'mutually acknowledge[d] one another as part of that same organization'"].)  The acts of Alvarez and Bernal, no matter what subset of Rockwood Street they may have belonged to, were predicate acts of members of the same criminal street gang Lopez and Navarrete sought to benefit.

        b.  <u>*Sanchez*</u>

      As a further challenge to the sufficiency of the evidence to support the predicate-acts element of the criminal street gang findings, Lopez and Navarrete argue Officer Hernandez's opinion regarding the association between the subsets and the Rockwood gang conveyed to the jury case-specific hearsay evidence prohibited by the Supreme Court's decision in *Sanchez*, *supra*, 63 Cal.4th 665, which held a gang expert may not "relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception."  (*Id.* at p. 686.)[19]

---

[19]    Trial in this case took place before the Supreme Court issued its decision in *Sanchez*, which disapproved the Court's earlier decision, *People v. Gardeley* (1996) 14 Cal.4th 605, "to the extent it suggested an expert may properly testify regarding case-specific out-of-court statements without satisfying hearsay rules."

In *Sanchez* the expert had based his opinion the defendant was a member of a certain gang on various police contacts during which the defendant was in the company of members of that gang, and on statements he made when given a "STEP notice" informing him he was associating with a known gang. (*Sanchez, supra*, 63 Cal.4th at pp. 672-673.) The expert admitted he had never met the defendant, was not present when the STEP notice was given or during any of the police contacts, and his knowledge of these matters was derived from police reports and a field identification card. (*Id.* at p. 673.) As the Court explained in finding these statements had been improperly admitted, "Any expert may still *rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so. Because the jury must independently evaluate the probative value of an expert's testimony, Evidence Code section 802 properly allows an expert to relate generally the kind and source of the 'matter' upon which his opinion rests. . . . There is a distinction to be made between allowing an expert to describe the type or source of the matter relied upon as opposed to presenting, as fact, case-specific hearsay that does not

---

(*Sanchez, supra*, 63 Cal.4th at p. 686, fn. 13.) The Supreme Court has granted review in *People v. Perez* (review granted July 18, 2018, S248730) to decide whether a defendant who failed to object at trial before *Sanchez* was decided, as here, forfeits a claim of *Sanchez* error subsequently advanced on appeal. (See *People v. Mendez* (2019) 7 Cal.5th 680, 694.) We consider the merits of Lopez and Navarrete's claim of error based on *Sanchez* in the interest of judicial economy. (See generally *People v. Welch* (1993) 5 Cal.4th 228, 237-238 [no forfeiture "where an objection would have been futile or wholly unsupported by substantive law then in existence"].)

otherwise fall under a statutory exception.  [¶]  What an expert *cannot* do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Sanchez,* at pp. 685-686.)

Moreover, like any hearsay, if the out-of-court statement is testimonial and is offered against the defendant in a criminal prosecution, *Crawford v. Washington* (2004) 541 U.S. 36 [124 S.Ct. 1354, 158 L.Ed.2d 177] (*Crawford*) and its progeny govern its admissibility.  (See *Sanchez, supra,* 63 Cal.4th at p. 686.) "Testimonial statements are those made primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony.  Nontestimonial statements are those whose primary purpose is to deal with an ongoing emergency or some other purpose unrelated to preserving facts for later use at trial." (*Id.* at p. 689; accord, *People v. Gallardo* (2017) 18 Cal.App.5th 51, 67 ["to be 'testimonial' under *Crawford*, the statement must have been 'given *and* taken primarily for the purpose [of] . . . establish[ing] or prov[ing] some past fact for possible use in a criminal trial'"]; *People v. Lara* (2017) 9 Cal.App.5th 296, 336-337.)

Here, Lopez and Navarrete tacitly concede the propriety of Officer Hernandez's testimony that Lopez was a Rockwood Street member and Navarrete an associate, the evidence at issue in *Sanchez,* but argue his opinion the Westmoreland and K.T.O. subsets were associated with, and part of, the Rockwood gang presented inadmissible case-specific hearsay without independent supporting proof.  They also contend Officer Hernandez's testimony Alvarez and Bernal were Rockwood gang members was inadmissible under *Sanchez.*

Lopez and Navarrete misperceive the nature of Officer Hernandez's opinion testimony concerning the subsets of the Rockwood gang. As discussed, expert testimony that relies on hearsay is still admissible provided the expert only tells the jury in general terms the bases for his or her opinion and does not relate as true case-specific facts asserted in hearsay statements. (*Sanchez*, *supra*, 63 Cal.4th at pp. 685-868.) That is exactly what Hernandez did here, opining about the relationship of the Westmoreland and K.T.O. subsets to the Rockwood gang without repeating any specific statements from third parties regarding the operation and organization of the Rockwood gang. (Cf. *People v. Meraz* (2018) 30 Cal.App.5th 768, 781, review granted Mar. 27, 2019, S253629; *People v. Blessett* (2018) 22 Cal.App.5th 903, 945, review granted Aug. 8, 2018, S249250; *People v. Vega-Robles* (2017) 9 Cal.App.5th 382, 411.)

Moreover, in crafting an argument based not only on state hearsay law but also under the federal confrontation clause as articulated in *Crawford*, *supra*, 541 U.S. 36, Lopez and Navarrete make no attempt to demonstrate Officer Hernandez's testimony regarding the various subsets of Rockwood Street was based on testimonial hearsay, rather than personal knowledge. (See *Sanchez*, *supra*, 63 Cal.4th at p. 685 [confrontation clause implicated when the expert bases his or her opinion on case-specific testimonial hearsay].) An expert's testimony based on personal knowledge of case-specific facts is admissible. (*Id*. at p. 683.) The record reflects Officer Hernandez's testimony regarding Alvarez and Bernal was based on personal knowledge—he had testified at both men's trials for what was identified here as the gang's predicate offenses—and the certified minute orders from those cases. This evidence was sufficient to

support a finding as to the predicate offenses. (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1463; *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1228.)

### 9. *The Trial Court Did Not Err by Failing To Instruct on Attempted Voluntary Manslaughter*

The trial court has a duty to "instruct on all lesser included offenses supported by substantial evidence. [Citations.] The duty applies whenever there is evidence in the record from which a reasonable jury could conclude the defendant is guilty of the lesser, but not the greater, offense. [Citations.] That voluntary manslaughter is a lesser included offense of murder is undisputed. [Citations.] [¶] Imperfect self-defense, which reduces murder to voluntary manslaughter, arises when a defendant acts in the actual but unreasonable belief that he is in imminent danger of death or great bodily injury." (*People v. Duff* (2014) 58 Cal.4th 527, 561-562.) These principles extend to "one who kills in imperfect defense of others—in the actual but unreasonable belief he must defend another from imminent danger of death or great bodily injury." (*People v. Randle* (2005) 35 Cal.4th 987, 997, overruled on another ground in *People v. Chun* (2009) 45 Cal.4th 1172, 1201; see *People v. Nguyen* (2015) 61 Cal.4th 1015, 1066 [imperfect self-defense or defense of others requires "'an unreasonable belief that harm was imminent'"].)[20]

Lopez and Navarrete contend the facts demonstrated that Martinez was attempting to protect Lopez from an attack by the

---

[20] "Imperfect defense of others, like imperfect self-defense, is not a true defense, but a shorthand description for a form of voluntary manslaughter." (*People v. Trujeque* (2015) 61 Cal.4th 227, 271.)

three men who came from the church parking lot, and his use of deadly force, while unreasonable, supported an instruction on attempted voluntary manslaughter as to Baquiax. But they cite nothing in the record to support this contention, instead only making a generalized argument the evidence established "Martinez was acting to protect [Lopez] from attack by others who outnumbered her." What the evidence actually showed, was that, after Acosta confronted Lopez, who was spray painting graffiti on the church wall, she attacked him, knocking him to the ground and kicking him. When Baquiax and Ordonez came out but were still six to 12 feet away, Lopez ran to the BMW. At the same time, Martinez got out of the BMW and shot at Baquiax and Ordonez. At that point Lopez was in no danger; she certainly was not under attack and outnumbered by three men.

10. *Lopez and Navarrete Are Entitled to New Sentencing Hearings*

a. *Correction of sentencing errors*

Navarrete contends, the People concede, and we agree the trial court erred in imposing five-year enhancements for a prior serious felony (§ 667, subd. (a)(1)) and in imposing both the firearm-use and criminal street gang enhancements (although the gang enhancements were stayed). This second error affected the sentence of both Lopez and Navarrete.

The information alleged Navarrete had a prior robbery conviction constituting a strike within the meaning of sections 667, subdivisions (b) through (i), and 1170.12. It did not allege the robbery was also a serious felony under section 667, subdivision (a)(1). Navarrete admitted the strike prior, and the trial court sentenced Navarrete as a second strike offender. But the court also imposed five-year enhancements for a prior serious

65

felony conviction under section 667, subdivision (a)(1), on Navarrete's indeterminate life terms for both murder and attempted premeditated murder.

A prior serious felony enhancement under section 667, subdivision (a)(1), is subject to pleading and proof requirements. (*People v. Nguyen* (2017) 18 Cal.App.5th 260, 267; see *People v. Jackson* (1985) 37 Cal.3d 826, 835, fn. 12, overruled on another ground in *Guerrero* (1988) 44 Cal.3d 343, 348.)  Because that enhancement was not pleaded and proved by the People here, the trial court erred in imposing the five-year terms.

As to the murder and attempted murder counts, the trial court imposed on both Navarrete and Lopez 25-year-to-life firearm-use enhancements under section 12022.53, subdivisions (d) and (e)(1).[21]  It also improperly imposed on those two counts, and stayed, 10-year gang enhancements pursuant to section 186.22, subdivision (b)(1)(C).

Subdivision (e)(1) of section 12022.53 permits the trial court to impose a firearm-use enhancement on a principal who did not personally use a firearm "'if both of the following are pled and proved:  [¶]  (A)  The person violated subdivision (b) of Section 186.22.  [¶]  (B)  Any principal in the offense committed any act specified in subdivision (b), (c), or (d).'" (*People v. Brookfield* (2009) 47 Cal.4th 583, 590.)  Subdivision (e)(2) of section 12022.53 "limits the effect of subdivision (e)(1).  A defendant who *personally* uses or discharges a firearm in the commission of a gang-related offense is subject to *both* the

---

[21]  The minute orders entered following the sentencing hearings and abstracts of judgment as to both Navarrete and Lopez erroneously reflect the firearm-use enhancements were imposed pursuant to section 12022.53, subdivision (b).

increased punishment provided for in section 186.22 *and* the increased punishment provided for in section 12022.53.  In contrast, when another principal in the offense uses or discharges a firearm but the defendant does not, there is no imposition of an 'enhancement for participation in a criminal street gang . . . in addition to an enhancement imposed pursuant to' section 12022.53." (*Brookfield*, at p. 590.)  Accordingly, the trial court erred in imposing enhancements pursuant to section 186.22, subdivision (b)(1)(C).  (See *Brookfield*, at p. 596.)  For the same reason, the trial court erred in imposing both the firearm-use enhancement and a 15-year minimum parole eligibility period under section 186.22, subdivision (b)(5),[22] as to the attempted premeditated murder count.  (*Brookfield*, at p. 595 ["the word 'enhancement' in section 12022.53(e)(2) refers to both the sentence enhancements in section 186.22 *and* the penalty provisions in that statute"]; accord, *People v. Gonzalez* (2010) 180 Cal.App.4th 1420, 1427 ["the trial court erred in imposing the gang statute's minimum parole eligibility period in addition to the 25-year gun enhancement"]; see *People v. Valenzuela* (2011) 199 Cal.App.4th 1214, 1238.)

We remand the case to permit the trial court to correct these sentencing errors, as well as to address the other sentencing matters discussed in this opinion.

---

[22]     Section 186.22, subdivision (b)(5), provides:  "Except as provided in paragraph (4), any person who violates this subdivision in the commission of a felony punishable by imprisonment in the state prison for life shall not be paroled until a minimum of 15 calendar years have been served."

b. *Consideration of the discretion created by SB 620*

On October 11, 2017, while Lopez's and Navarrete's petitions for review were pending in the Supreme Court, the Governor signed SB 620, amending section 12022.53 to give discretion to the trial court to strike a firearm enhancement in the interest of justice. (See Stats. 2017, ch. 682, § 2; § 12022.53, subd. (h) ["The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section. The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law"].)[23]

In transferring the case to us earlier this year, the Supreme Court directed us to consider the effect of SB 620. Lopez, Navarrete and the Attorney General all agree remand is appropriate to permit the trial court to exercise its new sentencing discretion on the firearm enhancements. (See *People v. Billingsley* (2018) 22 Cal.App.5th 1076, 1079-1080; *People v. McDaniels* (2018) 22 Cal.App.5th 420, 424-425.)[24]

---

[23] Former section 12022.53, subdivision (h), provided, "Notwithstanding Section 1385 or any other provision of law, the court shall not strike an allegation under this section or a finding bringing a person within the provisions of this section."

[24] If the court exercises its discretion to dismiss or strike the firearm-use enhancements imposed pursuant to section 12022.53, subdivision (e)(1), it will also need to decide whether to impose or strike the previously stayed criminal street gang enhancements. (See § 186.22, subd. (g) [court may strike the additional punishment for enhancements provided by section 186.22 if the interests of justice would best be served by that disposition].)

### c. *Providing an opportunity for Lopez to demonstrate youth-related characteristics*

Section 3051, originally enacted in 2013 (Stats. 2013, ch. 312, § 4), now provides in part, "A person who was convicted of a controlling offense that was committed when the person was 25 years of age or younger and for which the sentence is a life term of less than 25 years to life shall be eligible for release on parole by the [Board of Parole Hearings] during his or her 20th year of incarceration at a youth offender parole hearing . . . ." (§ 3051, subd. (b)(2).)  Lopez was 22 years old when she committed the crimes at issue in this case and, accordingly, will be entitled to a youth offender parole hearing under section 3051. As Lopez requests, on remand the trial court must provide her an opportunity to present evidence of her youth-related characteristics that will be evaluated at her future youth offender parole hearing, as contemplated by the Supreme Court's decision in *Franklin*, *supra*, 63 Cal.4th 261.

In *Franklin*, decided shortly after Lopez was sentenced, the Supreme Court explained section 3051, together with section 4801, subdivision (c), "contemplate that information regarding the juvenile offender's characteristics and circumstances at the time of the offense will be available at a youth offender parole hearing to facilitate" consideration by the Board of Parole Hearings.  (*Franklin*, *supra*, 63 Cal.4th at p. 283.)  Because assembling such evidence is "more easily done at or near the time of the juvenile's offense rather than decades later" (*id.* at pp. 283-284), the Court remanded the case to the trial court to give Franklin an opportunity to "put on the record the kinds of information that sections 3051 and 4801 deem relevant at a youth offender parole hearing" (*id.* at p. 284).

69

Lopez has acknowledged section 3051 was in effect at the time of her sentencing hearing and her counsel "perfunctorily addressed" the relevant factors. Given the heightened significance of youth-related information to subsequent parole evaluations as described in *Franklin*, however, Lopez must be given the opportunity to make a more complete record for use at a future youth offender parole hearing. (*People v. Jones* (2017) 7 Cal.App.5th 787, 819 ["*Franklin* made clear that the sentencing hearing has newfound import in providing the juvenile with an opportunity to place on the record the kinds of information that 'will be relevant to the [parole board] as it fulfills its statutory obligations'"]; see *People v. Tran* (2018) 20 Cal.App.5th 561, 570.) We simply cannot assume defense counsel at a sentencing hearing that preceded *Franklin* anticipated the extent to which evidence of youth-related factors was a critical component of the hearing. (*Tran*, at p. 570 ["[b]ecause appellant did not have the benefit of that decision [(*Franklin*)] at the time of his sentencing hearing, fairness dictates the matter be remanded for further proceedings"]; *Jones*, at p. 820 ["[I]t is unclear whether Jones understood both the need and the opportunity to develop the type of record contemplated by *Franklin*. Accordingly, we remand the matter so that the trial court can follow the procedures outlined in *Franklin* to ensure that such opportunity is afforded to Jones"].)

## DISPOSITION

The matter is remanded to provide Lopez and Navarrete an opportunity to petition the trial court pursuant to section 1170.95 to vacate their convictions for second degree murder and to resentence them as specified in section 1170.95, subdivision (d). Their convictions for attempted premeditated murder and

70

vandalism and the associated firearm-use and criminal street gang enhancements are affirmed. The sentences imposed are vacated, and the trial court is directed to resentence them to correct the errors discussed in this opinion, to exercise the discretion it now possesses with respect to the firearm-use and criminal street gang enhancements and to provide Lopez a *Franklin* hearing.

PERLUSS, P. J.

We concur:

SEGAL, J.

FEUER, J.